# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1401 | **DATE** | 3/12/2004 |
| **CASE TITLE** | Quixote Transportation vs. Anthony Cooper | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the Court denies QTS's motion for summary judgment (15-1). The case is set for a status hearing on 4/1/04 at 10:30 a.m. Counsel for QTS is requested to contact Cooper to make arrangements for him to participate by telephone.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 1 6 2004 date docketed | 20 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | JXM docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | | |
| OR | courtroom deputy's initials | 2004 MAR 15 PM 3:39 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED
MAR 1 6 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| QUIXOTE TRANSPORTATION SAFETY, INC., | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) <br> ) |
| v. | ) Case No. 03 C 1401 <br> ) |
| ANTHONY COOPER | ) <br> ) <br> ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Quixote Transportation Safety, Inc. ("QTS") seeks to enforce the non-compete and non-disclosure provisions of *pro se* defendant Anthony Cooper's expired consulting contract with QTS. The case is before this Court on QTS's motion for summary judgment and request for injunctive relief. Cooper adamantly denies using or disclosing QTS's confidential information to the benefit of QTS' competitors. Because a genuine issue of fact exists, we deny QTS' motion for summary judgment.

### Background

Tony Cooper, a British citizen who resides in Cyprus, has worked in the Middle East since 1968 and exclusively in the traffic safety field since 1976. Def.'s Resp. ¶¶ 1-2. He sells paint for road stripping, reflective pavement markers, reflective sheeting, road striping machines, speed signs, traffic signal cameras and other traffic products on behalf of several companies. Pl.'s Facts ¶ 36. He also is the chief executive of HSP Group, which sells traffic products. *Id.* ¶

1



37. QTS, a Delaware corporation that markets, sells and distributes transportation safety equipment manufactured by affiliated businesses, retained Cooper as a consultant to sell QTS's crash cushions, flexible posts and changeable message signs to Middle Eastern governments and government contractors. *Id.* ¶¶ 1, 2, 19. Cooper's seventeen-year relationship with QTS was fruitful: QTS's annual gross profits from Cooper's activities ranged from $2,000 to $600,000, Pl.'s Facts ¶ 16, and Cooper earned $1,000 per month as a consulting fee, a 10 percent commission on the first $300,000 of QTS products sold and 15 percent thereafter, and reimbursement for travel in the region. *See* Consulting Agreement (Jan. 1, 2001 to Dec. 31, 2001) ¶ 3.

Cooper chose not to renew his contract with QTS in 2002 when QTS asked him to sign a new consulting agreement that materially altered the terms of their previous agreement by eliminating the monthly consulting fee, reducing his commission to 5 percent of QTS products sold, and limiting travel reimbursements to those meetings QTS requested Cooper attend. Def.'s Resp. at 2-3; Consulting Agreement (July 1, 2002 to June 30, 2004) ¶ 3. Cooper currently represents several traffic product companies in the Middle East, either on his own or in his capacity as chief executive of HSP Group. Pl.'s Facts ¶¶ 36, 37; Def.'s Resp. at 3-4. Since the expiration of his contract with QTS, Cooper has begun representing Barrier Systems, Inc. in the Middle East. Pl.'s Facts ¶¶ 29-30; Def.'s Resp. at 4.

Cooper's previous consulting agreements with QTS included non-disclosure and non-compete clauses. The non-disclosure clause states:

> Except as otherwise required in the performance of his duties and obligations hereunder, during the Term and at all times after the termination of this Agreement for whatever reason, Consultant will refrain from, directly or

> indirectly, using for the benefit of anyone other than the Company, or transferring or disclosing to others, without the prior written approval of the Company, any information not generally known in the Company's trade or industry about any of the following ("Confidential Information"):
> (a)   information relating to the Company's financial or business status or plans, sales or marketing methods, methods of doing business, suppliers, customers, customer usages and/or requirements; . . .

Consulting Agreement (January 1, 2001 to December 31, 2001) ¶ 4.1. The non-compete clause states:

> During the Term and until the third anniversary hereof, Consultant will not, without prior written consent of the Company's Board of Directors, become directly or indirectly associated (as an owner, partner, employee, independent contractor, consultant, advisor, or in any other capacity calling for the retention of personal services or acts of management, operation or control) with any person, firm, joint venture, partnership, corporation, institution or enterprise that engages in, or intends to engage in, a line of business which supplies, manufactures, sells or distributes any technologies or products competitive with or similar to the Company's products.

*Id.* ¶ 6.1.

QTS claims that Cooper is infringing his non-compete and non-disclosure agreements by selling crash cushions on behalf of Barrier Systems, Inc. in direct competition with QTS's crash cushions. Cooper denies disclosing or using any confidential information. Def.'s Resp. at 4-5. Cooper admits that Barrier Systems markets crash cushions in competition with QTS, but he points out that Barrier Systems' main product is a moveable barrier system and the company has not sold any crash cushions in the Middle East. *Id.* at 2. Cooper appears concerned that because QTS has several subsidiaries that market a wide range of traffic products, the non-compete agreement if enforced would make it impossible for him to continue to work in the traffic safety field because many of the companies he currently works for have at least some products competitive with those marketed by QTS or its affiliates. *Id.* at 3-4.

QTS states, however, that it is not trying to bar Cooper from selling all traffic safety products marketed by QTS-affiliated companies. QTS has expressly stated that its restrictive covenants with Cooper do not bar him from selling paint for road stripping, reflective pavement markers, reflective sheeting, road striping machines, speed signs, traffic signal cameras and other traffic products or other products sold by HSP. Pl.'s Facts ¶ 36-38. QTS says it only seeks to prevent Cooper from selling crash cushions, flexible posts and changeable message signs. Pl.'s Reply at 6.

The case presents a note-worthy complication. Cooper, who is located in Cyprus and says he is not familiar with our laws or rules of procedure, says he cannot afford to hire an attorney and has, thus far, represented himself in these proceedings. Although he responded to QTS' complaint and motion for summary judgment, he did not file the documents under oath. QTS urges us to deem its statement of facts admitted and disregard those factual assertions made by Cooper. But QTS rightly recognizes that the Court has discretion in how it handles procedural noncompliance. *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("[T]he decision whether to apply the [local] rule strictly or to overlook any transgression is one left to the district court's discretion."). The two responses Cooper filed in this case, read like declarations of facts of which Cooper has first-hand knowledge – like an affidavit. However, Cooper did not swear to the truth of the statements made in the documents. Rather than penalize Cooper for failing to comply with the Local Rules when it appeared he was making a good faith attempt to respond to QTS' suit, the Court directed Cooper to advise us "in writing, within 14 days of this order, whether he swears under the penalty of perjury as provided by U.S. law that all statements in the response are true." Order (dated February 18, 2004). The Court received a

document from Cooper stating: "I, Anthony A. Cooper, swear under the penalty of perjury as provided by U.S. law that the statements made in the 'Defendant's Response to the QTS' Claim' are true."[1] We are satisfied that the facts alleged in Cooper's Response can suffice for a Local Rule 56.1(b)(3) statement. Therefore, it is proper for the Court to rely on facts asserted by Cooper in his response.

## Analysis

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court's "function is not to weigh the evidence but merely to determine if 'there is a genuine issue for trial.'" *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002) (citation omitted). The Court evaluates admissible evidence in the record in the light most favorable to the nonmoving party. *Id.* But "[t]he nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Tr. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citation omitted).

QTS argues that Cooper should be held to the terms of the agreement he signed. However, "[i]t is improper under Illinois law to enforce a non-competition clause merely because the parties agreed to such an arrangement." *Advent Electronics, Inc. v. Buckman*, 112 F.3d 267,

---

[1] We ordered Cooper to respond by March 3, 2004. However, he did not sign the oath until March 4 and we did not receive the document, via FedEx, until March 11. The Court will excuse the tardiness of Cooper's oath because he is corresponding with us from Cyprus and we do not know how long it took for our order to reach him.

5

274 (7th Cir. 1997). First, the Court must inquire into whether "the covenant is ancillary to a 'valid contract.'" *Abel v. Fox*, 274 Ill. App. 3d 811, 813-14, 654 N.E.2d 591, 593 (1995). To be enforceable "[t]he covenant must be subordinate to the contract's main purpose." *Id.* at 814, 654 N.E.2d at 593. The non-compete and non-disclosure agreements were clauses in a longer consulting agreement, which specified the terms of Cooper's employment with QTS, including Cooper's responsibilities, compensation and length of employment. Thus, the clauses were sufficiently ancillary to a valid contract. The second preliminary question we must consider is "whether there [was] adequate consideration to support the covenant not to compete." *Id.* There was: Cooper's employment was extended for a year.

But meeting these thresholds is not enough to require enforcement of the agreement, because covenants not to compete are disfavored in Illinois. *Advent Electronics*, 112 F.3d at 274. The Court will enforce a restrictive covenant only when "the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the employer." *Outsource Int'l, Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999) (citation and internal quotation marks omitted); *A-Tech Computer Services, Inc. v. Soo Hoo*, 254 Ill. App. 3d 392, 401, 627 N.E.2d 21, 27 (1994). In evaluating the reasonableness of the non-compete, the Court considers "whether the restraint is greater than necessary to protect the promisee, whether enforcement would be injurious to the public, whether enforcement would cause undue hardship to the promisor, whether the durational and geographic scope of the covenant is reasonable, and whether the employer has a protectable business interest." *A-Tech Computer Services*, 254 Ill. App. 3d at 401; 627 N.E.2d at 27. The Illinois courts have recognized two legitimate business interests justifying the enforcement of non-compete agreements:

> (1) where the customer relationships are near-permanent and but for the employee's association with the employer and employee would not have had contact with the customers; and (2) where the former employee acquired trade secrets or other confidential information through his employment and subsequently tried to use it for his own benefit.

*Outsource Int'l*, 192 F.3d at 666 (citations omitted).

Illinois courts have recognized two standards for determining whether a near-permanent relationship exists. *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131, 142, 685 N.E. 2d 434, 443 (1997). The first weighs the presence of several factors, such as:

> (1) the number of years required to develop the clientele; (2) the amount of money invested to acquire clientele; (3) the degree of difficulty in acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customers' association with the employer; and (7) the continuity of employer-customer relationships.

*Agrimerica, Inc. v. Mathes*, 170 Ill. App. 3d 1025, 1031-32, 524 N.E.2d 947, 951 (1988) (citations omitted). To establish a legitimate business interest under this near-permanent relationship test, the plaintiff must also show that "but for the employment in question, the employee would not have come into contact with the employer's customers." *Id.* at 1033, 524 N.E.2d at 952 (citations omitted). QTS has not shown that but for Cooper's agreement with QTS, he would not have come into contact with QTS's customers. QTS states that Cooper represented several lines of traffic products in the Middle East during the time he also served as a consultant to QTS. Pl.'s Facts ¶ 36. It has not shown that he approached Middle Eastern governments and government contractors solely on behalf of QTS and not for or at the behest of the other companies he was representing in the region.

The second method recognized by Illinois courts for determining whether a near-

permanent customer relationship exists is to look at the business. Whereas "a near-permanent relationship with clients is inherent in the provision of professional services," it "is generally absent from businesses engaged in sales." *Lawrence & Allen*, 292 Ill. App. 3d at 142, 685 N.E. 2d at 444 (citation omitted). As the Seventh Circuit has explained,

> [t]he Illinois cases distinguish between sellers of services, especially professional services such as accounting and consulting, and sellers of ordinary goods. In the former class, where the quality of the seller's service is difficult to determine by simple inspection, customers come to repose trust in a particular seller, and that trust is a valuable business asset, created by years of careful management, that the employee is not allowed to take away with him. In the latter case, involving the sale of goods, the element of trust is attenuated, particularly where as in this case the good is a simple and common one sold under competitive conditions. In these cases Illinois law does not permit the seller to claim a protectable interest in his relations with his customers.

*Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 948 (7th Cir. 1994) (citations omitted). Because QTS is a seller of goods, not services, near-permanent customer relationships are unlikely. Thus, QTS cannot satisfy the near-permanent customer relationship test under either standard utilized by the Illinois courts.

The alternative rationale for enforcing a restrictive covenant is "if the employee learned trade secrets or other confidential information while in the plaintiff's employ and subsequently attempted to use it for his or her own benefit." *Outsource Int'l*, 192 F.3d at 668 (quoting *Springfield Rare Coin Galleries, Inc. v. Mileham*, 250 Ill. App. 3d 922, 930, 620 N.E. 2d 479, 485 (1993)). QTS argues that its price information and sales strategy in the region were confidential and that Cooper had access to this information – in fact, it would seem Cooper devised the sales strategy for the region. Cooper disputes that this information is confidential. Def.'s Resp. at 5-6. He points out that because regional clients for traffic safety equipment are

8

governments paying for the products with public funds, the purchase prices are publicly available. *Id.* at 5-6. Cooper also says his knowledge of QTS's pricing structure from two years ago has no relevance today. *Id.* at 6. As for QTS's strategic plans for the region, because Cooper wrote these documents while representing several other traffic safety product companies, there is a genuine dispute of fact as to whether the strategy he devised for QTS – or his knowledge of potential clients – was unique to QTS. *Id.* at 5.

Even if we assume that Cooper gained confidential information during his employment with QTS, a genuine issue of fact exists as to whether Cooper has used or attempted to use QTS's allegedly confidential information. He "strenuously" denies divulging confidential information. *Id.* at 4. And his claim that Barrier Systems has not sold any crash cushions in the Middle East, *id.* at 2, belies QTS's claims that Cooper has been using QTS's confidential information to its disadvantage. Because a genuine issue of fact exists as to whether Cooper was aware of QTS's confidential information and used that information to its disadvantage, QTS is not entitled to summary judgment on its claim that Cooper is infringing upon a valid non-compete agreement.

Perhaps in recognition of the lack of undisputed evidence of specific use of confidential information, QTS offers an alternate ground for enjoining Cooper's behavior: the non-disclosure agreement. QTS argues that the Court must enjoin Cooper from selling crash cushions, flexible posts and changeable message signs because if he does so, it is inevitable that he will rely on QTS's confidential information. The Seventh Circuit has recognized that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will

9

inevitably lead him to rely on the plaintiff's trade secrets."[2] *Pepsico, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (citation omitted). *See also Strata Marketing, Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1070, 740 N.E.2d 1166, 1178 (2000) ("*PepsiCo* correctly interprets Illinois law and [we] agree that inevitable disclosure is a theory upon which a plaintiff in Illinois can proceed under the [Illinois Trade Secrets Act].") But "the mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose . . . trade secret information' so as to 'demonstrate irreparable injury.'" *Pepsico*, 54 F.3d at 1269 (quoting *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1207 (7th Cir. 1987)).

QTS has not proven to the Court's satisfaction that Cooper is privy to confidential information. *See Curtis 1000*, 24 F.3d at 947 ("[C]onfidential information, to be protectable, must be – confidential."). As discussed above, Cooper has raised a genuine issue of fact as to whether he is aware of information that can be truly categorized as confidential. Furthermore, the Court notes that even if we found Cooper had confidential information, we could not enforce the non-disclosure agreement as written. The non-disclosure clause bars use of QTS's confidential information *at all times* – that is, in perpetuity – *in all places*. By arguing that it is entitled to relief under the permanent non-disclosure clause because it is inevitable that Cooper will use confidential information in his employment, QTS is essentially seeking a permanent, worldwide prohibition on competition. In other words, if we accept that QTS can establish a violation of this particular non-disclosure agreement by showing Cooper will inevitably use the

---

[2] We have found at least one case applying the inevitable use doctrine to a claim arising under a non-disclosure agreement that involved neither trade secrets or the ITSA. *See Kempner Mobile Electronics, Inc. v. Southwestern Bell Mobile Systems, LLC*, No. 02 C 5403, 2003 WL 1057929, at * 22 (N.D. Ill. March 10, 2003).

confidential information if employed by a competitor, then the non-disclosure agreement as written effectively becomes a permanent non-compete agreement. The Illinois courts have long rejected the reasonableness of such restrictions; the agreement cannot be enforced if it does not place reasonable limitations on the duration of the restriction. *EEOC v. Severn Trent Services, Inc.*, No. 03-2631, 2004 WL 235271 (7th Cir. Feb. 10, 2004) (stating a non-compete clause "would be unenforceable if its duration were 'unreasonable,' as it might be under Illinois law . . . if it exceeded two or three years, and almost certainly if it exceeded five" years). The non-disclosure agreement, when coupled with the inevitable discovery theory of infringement, is unenforceable as written.

A genuine issue of fact exists as to whether Cooper is privy to confidential information and if so, whether he has used that information to the benefit of QTS's competitors. Because these facts are relevant to the enforceability of both the non-compete and non-disclosure clauses, we must deny QTS's motion for summary judgment in its entirety.

## Conclusion

For the reasons stated above, the Court denies QTS's motion for summary judgment [docket # 15-1]. The case is set for a status hearing on April 1, 2004 at 10:30 a.m. Counsel for QTS is requested to contact Cooper to make arrangements for him to participate by telephone.

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　MATTHEW F. KENNELLY
　　　　　　　　　　　　　　　　　　United States District Judge

Date: March 12, 2004